## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2017, 10:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Special Assistant to the State Public Defender
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.K. (Minor Child)<br><br>and<br><br>T.K. (Father),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | December 29, 2017<br><br>Court of Appeals Case No. 28A01-1708-JT-2072<br><br>Appeal from the Greene Circuit Court<br><br>The Honorable Erik C. Allen, Judge<br><br>Trial Court Cause No. 28C01-1609-JT-22 |

**Crone, Judge.**

## Case Summary

T.K. ("Father") appeals a trial court judgment terminating his parent-child relationship with his two-and-a-half-year-old daughter, A.K.[1] He asserts that the evidence is insufficient to support the trial court's conclusion that there is a reasonable probability that the conditions that led to A.K.'s removal will be remedied and that termination is in A.K.'s best interests. Finding the evidence and unchallenged findings sufficient to support the termination order, we affirm.

## Facts and Procedural History

On January 1, 2015, A.K. was born to Father and Mother. Both parents had used methamphetamine ("meth") before and during the pregnancy, and A.K. was born with meth in her system. Four days later, the Department of Child Services ("DCS") removed A.K. from her parents and placed her in foster care with her three half brothers.[2] Shortly thereafter, DCS initiated a petition to have A.K. adjudicated a child in need of services ("CHINS"). Family Case Manager ("FCM") Lisa Burton reported that Father was essentially homeless when the CHINS case was initiated and that she made referrals for him for substance abuse treatment and random drug screens. In the three months

---

[1] The order also terminated the parental rights of A.K.'s mother, J.C., to A.K. and Mother's three other children. Mother is not participating in this appeal.

[2] A.K.'s half brothers were already the subjects of dispositional orders at that time.

immediately following A.K.'s removal, Father attended about half of his scheduled visits with A.K. and participated intermittently in services and drug screens. He failed to complete a substance abuse assessment and did not secure stable housing. He continued to use illegal drugs, which resulted in Mother ending their romantic relationship.

[3] In February 2015, Father admitted to the CHINS allegations, and A.K. was adjudicated a CHINS. In April 2015, the trial court issued a dispositional order, requiring Father to secure and maintain suitable employment and housing, attend all scheduled visitation sessions, assist in formulating and implementing a child protection plan, allow DCS access to home visits, maintain regular contact with DCS, notify DCS of address changes or arrests, submit to a drug treatment assessment and follow all recommendations, refrain from possessing or using illegal drugs, and refrain from alcohol consumption. Ex. A-18.

[4] Shortly thereafter, an arrest warrant was issued for Father, and he fled the county to avoid facing the criminal charges. He did not notify DCS, and DCS was unable to locate him. He ceased participating in any services at that time, and he last visited A.K. on April 3, 2015. In July 2015, authorities located Father, and he was incarcerated. He ultimately was convicted of class B felony burglary and was sentenced to seven years, with two years suspended to probation. DCS personnel learned of Father's incarceration and sent him letters at the prison instructing him to contact DCS. Father did not contact DCS as instructed. At the factfinding hearing, Father said that he completed a

substance abuse treatment program and a parenting course during his incarceration, for which he received goodtime credit. Father did not provide documentation to support these claims.

[5] Meanwhile, A.K. remained in foster care with her older half brothers until August 2015, when all four children were placed with Mother for a trial home visit. In December 2015, Mother tested positive for meth, and DCS removed the children and returned them to foster care.

[6] In September 2016, DCS changed the permanency plan for A.K. and her half brothers to termination and adoption, filing a joint petition for termination as to Mother, Father, and the fathers of A.K.'s half siblings. In June 2017, the trial court conducted a three-day factfinding hearing on the termination petitions. Court Appointed Special Advocate ("CASA") MaeBell McCafferty, who had worked with the family since 2012, testified that the children are bonded to each other and also have bonded with their preadoptive foster parents. She stated that the children would be traumatized if separated or removed from their foster parents. The foster parents testified that A.K.'s older brothers are protective of her and that A.K., though initially skeptical of being around men, has become increasingly bonded to her foster father.

[7] On July 27, 2017, the trial court issued an order with findings of fact and conclusions thereon, terminating the parent-child relationships between A.K. and Father and Mother, as well as A.K.'s older half siblings and their parents, with all four children to be adopted by the foster family.

Father now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

Father challenges the sufficiency of the evidence to support the trial court's judgment terminating his parental relationship with A.K. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id*. "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

In *Bester*, our supreme court stated,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights.

> Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

839 N.E.2d at 147 (citations, quotation marks, and alteration omitted).

[11] To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[12] In recognition of the seriousness with which we address parental rights termination cases, Indiana has adopted a clear and convincing evidence

standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted).

[13] Here, the trial court issued extensive findings of fact and conclusions thereon.[3] Father appears to challenge the following ultimate findings/conclusions:

> 21. Father had a serious history of methamphetamine abuse prior to the birth of A.K. He struggled to maintain a job or stable housing as a result and even admitted to using methamphetamine with Mother while she was pregnant. DCS made provider referrals to address Father's substance abuse issues, employment and homelessness. Supervised visitation and random drug screens were scheduled. From the time A.K. was born in January, 2015, to April, 2015, he struggled to maintain attendance at all scheduled visits, did not submit to all scheduled drug screens and did not engage in services to address to [sic] his substance abuse, unemployment or homelessness.
>
> 22. When Father became aware that there were warrants for his arrest for serious felony charges, he chose to go into hiding for over three (3) months to avoid arrest. During this time he did not visit with A.K. or participate in drug screens or any other services. When given the choice between timely dealing with the

---

[3] Many of the findings include the parents' and children's first names. For consistency's sake, we use the aforementioned designations.

consequences of his criminal actions, Father chose to prolong his legal troubles and to not visit with his child. After he was arrested, Father admitted that he did not make efforts to remain in contact with DCS or request anything from the Court, despite being represented by counsel.

23. Father admitted that he has been using methamphetamine for at least a decade and that it has seriously affected his life. Despite this, his prior criminal history and the services offered by DCS (and ordered by the Court in the Dispositional Order regarding A.K.), he did not engage in a substance abuse program. Father testified that he participated in a substance abuse program while incarcerated and a parenting program called Inside/Out Dads. However, he did not notify DCS or the Court of the details, requirements or certifications of these programs in the CHINS case, provide DCS or the Court with a certificate of completion for these programs or call any witnesses to testify to the requirements of the programs or their certifications at the TPR fact finding. Father did not dispute that he did not make efforts to contact DCS while incarcerated.

Appellant's App. Vol. 2 at 91-92.

## Section 1 – Father has failed to demonstrate clear error concerning the reasonable probability that the conditions that led to A.K.'s removal will not be remedied.

[14] Father maintains that the evidence is insufficient to support the trial court's conclusion that a reasonable probability exists that the conditions that led to A.K.'s removal will not be remedied.[4] When assessing whether there is a

---

[4] Father also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to A.K.'s well-being. Indiana Code Section 31-35-

reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the trial court should judge a parent's fitness to care for his [or her] children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[15] Father admits that he has abused illegal drugs for the past ten years. His (and Mother's) drug use, as well as A.K.'s positive test for meth, precipitated A.K.'s initial removal just four days after her birth. In an effort to get clean, Mother

2-4(b)(2)(B) requires DCS to prove only *one* of the three circumstances listed. Because we find no error concerning the reasonable probability that the conditions will not be remedied, we need not address the threat to the child's well-being.

ended her romantic relationship with Father due to Father's continued use of meth during the CHINS proceedings. Father admitted that his drug use had hindered his ability to hold a steady job and to maintain suitable housing. He resorted to criminal activity to secure funds to support his habit, and his 2015 arrest and conviction for burglary landed him in the Department of Correction ("DOC") during the latter stages of the CHINS proceedings and the entire pendency of the termination proceedings. To the extent that he asserts that he is now "sober," Appellant's Br. at 17, we note that his newfound sobriety could be attributable to his incarceration.

[16] As for Father's efforts at visitation, we note that even before his incarceration, he did not regularly visit A.K. Tr. Vol. 2 at 109. The record shows that he attended roughly half of his scheduled visitation sessions in the months immediately following A.K.'s removal and the initiation of the CHINS case. When he learned that he was subject to an active arrest warrant for burglary and other theft-related offenses, he left the county to avoid arrest, and for the ensuing three months, he was on the run and had no contact with A.K. or DCS. His last contact with A.K. was in April 2015, when the child was only three months old. There is no indication that he asked DCS to arrange visitation at the jail/prison. As for his failure to otherwise contact A.K. during his incarceration, Father submits that regular contact with A.K. was "not feasible" and argues that "[d]ue to A.K.'s young age, it would have been futile to send A.K. letters or attempt to talk to her on the telephone." Appellant's Br. at 17. Father failed to avail himself of the opportunities to visit or contact A.K. when

he could and now blames his incarceration for the vacuum in his relationship with A.K. *See Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (parent's failure to exercise right to visit his child demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship) (citation omitted), *trans. denied*.

[17] With respect to services, we again note that Father's participation before his incarceration was sporadic. Tr. Vol. 2 at 109. FCM Burton testified that at the time Father was incarcerated, he still had open referrals that could have been utilized. Father asserts that he completed an intensive drug treatment program and a parenting course while in prison for which the trial court did not give him proper consideration. He cites as support *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009), in which our supreme court reversed the termination of the rights of an incarcerated parent who, while in the DOC, actively maintained contact with her young son and availed herself of courses offered at the prison. While Father correctly observes that the *G.Y.* court found the mother's completion of coursework while incarcerated was entitled to positive consideration, we observe that the mother's coursework was well documented in that case. In contrast, Father presented no documentation to support his assertions that he completed the coursework, and we decline his invitation to reweigh evidence and reassess his credibility. In short, Father's history of substance abuse, as well as his criminal history, unemployment and housing issues, and sporadic participation in services and visitation, together support the trial court's

conclusion that there is a reasonable probability that the conditions that led to A.K.'s removal will not be remedied.

## Section 2 – Father has failed to demonstrate clear error concerning A.K.'s best interests.

[18] Father asserts that the trial court clearly erred in concluding that termination is in A.K.'s best interests. Although not dispositive, permanency and stability are key considerations in determining the best interests of a child. *G.Y.*, 904 N.E.2d at 1265. A determination of a child's best interests should be based on the totality of the circumstances. *In re A.P.*, 981 N.E.2d 75, 84 (Ind. Ct. App. 2012).

[19] Father was incarcerated during the entire pendency of the termination proceedings. As discussed, he submits that his incarceration was an impediment to his visitation and that he has made great efforts at self-improvement while incarcerated. He also claims that the court failed to properly consider his potential for early release when examining A.K.'s best interests. He cites as support *G.Y.*, 904 N.E.2d at 1265, in which our supreme court found reversible error in the termination of an incarcerated mother's rights where she was soon to be released from prison. However, potential early release is not sufficient, by itself, to support a best interest finding, and the *G.Y.* court emphasized that the factors of permanency and stability must not be taken in isolation but must be considered as part of the totality of the circumstances bearing on the best interest determination. *Id*. There, the mother's coursework while incarcerated was well documented and, despite her incarceration, she

maintained consistent contact with her child with whom she had a previously established relationship. *Id.*

[20] We believe Father's circumstances to be more akin to those of the father in *In re Adoption of O.R.*, 16 N.E.3d 965, 975 (Ind. 2014). There, the incarcerated father had "'no existing relationship' with the child," and in evaluating the best interests of the child, our supreme court distinguished *G.Y.* as a case involving a parent who had "an established relationship with the child[] prior to incarceration or maintained significant communication with [hi]m while in prison." *Id.* Here, Father has no previously established bond or relationship with A.K., who was removed from him and Mother when she was four days old and has not seen Father since she was three months old. When he fled the county to avoid police, he essentially opted out of additional time with A.K. prior to incarceration and postponed his prison stay to a later date.

[21] That said, we acknowledge Father's concern that his parental rights not be terminated solely on the basis of his incarceration. *See K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 644 (Ind. 2015) (incarceration is insufficient basis upon which to terminate parent's rights). However, the findings and conclusions thereon show that the trial court did not rely solely on Father's incarceration but instead considered the totality of the circumstances. *See* e.g., Appellant's App. Vol. 2 at 91-92 (indicating court's consideration of Father's drug use and its effect on his housing and employment, criminal offenses related to drug use, failure to fully participate, and failure to stay in contact with A.K. and DCS). We recognize Father's fundamental liberty interests in parenting A.K., but we

are also mindful that his parental interests are not absolute, must be subordinated to A.K.'s best interests, and may be terminated if he is unable or unwilling to meet his parental responsibilities. *K.E.*, 39 N.E.3d at 1259-60.

[22] DCS caseworker Madison Fox testified at the factfinding hearing concerning the reason for changing the permanency plan to adoption. She emphasized the parents' lack of consistent contact and on and off participation in services, as well as the children's bond with the foster parents and each other. *See* Tr. Vol. 2 at 178-80 (adding that the children would be "extremely traumatized being taken out of" their preadoptive foster home). CASA McCafferty testified that she did not believe that Father "has the ability to provide a safe and stable home for A.K." *Id.* at 140. She also testified that she had worked with A.K. and her older half brothers for several years and that in her opinion, termination and adoption by the foster parents is in A.K.'s best interests. *Id.* at 141. She based her opinion on long-term observations of A.K.'s interaction and bond with the foster parents as well as the bond between A.K. and her three half brothers. "[T]he testimony of service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[23] The totality of the circumstances supports the trial court's conclusion that termination is in A.K.'s best interests. Based on the foregoing, we conclude that Father has failed to establish clear error in the trial court's decision to terminate his parent-child relationship with A.K. Consequently, we affirm.

Affirmed.

Robb, J., and Bradford, J., concur.